UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                   :
BYRON SHAND                    :               3:15 CV 761 (JGM)
                                   :
V.                                 :
                                   :
CAROLYN W. COLVIN         :
COMMISSIONER OF SOCIAL     :
SECURITY ADMINISTRATION[1]   :          DATE: JANUARY 12, 2018
                                   :
------------------------------------------------------- x

<u>RULING ON PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE DECISION OF THE
COMMISSIONER AND ON DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g)

and 1383(c), seeks review of a final decision by the Commissioner of Social Security

["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and Supplemental Security

Income Benefits ["SSI"].

## I. ADMINISTRATIVE PROCEEDINGS

On July 23, 2013, plaintiff filed an application for DIB and SSI benefits claiming

that he has been disabled since December 19, 2011 due to depression and right hip

problems. (Certified Transcript of Administrative Proceedings, dated June 17, 2015 ["Tr."]

218-29; <u>see also</u> Tr. 83). Plaintiff's application was denied initially (Tr. 83-106; <u>see also</u>

Tr. 81-82, 138-47) and upon reconsideration (Tr. 107-35; <u>see also</u> Tr. 136-37, 148-57).[2]

On July 10, 2014, plaintiff filed his request for a hearing before an Administrative Law

Judge ["ALJ"](Tr. 158-59; <u>see also</u> Tr. 160-77, 180-204, 210-11, 216-17). A hearing was

---

[1]At the time this action was filed, Carolyn W. Colvin was the Acting Commissioner of Social
Security. On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2]Plaintiff has been represented by counsel since September 29, 2014. (Tr. 212-13).

held briefly on September 2, 2014 and then again December 16, 2014 before ALJ Ryan A. Alger, at which plaintiff, plaintiff's case worker, and a vocational expert testified. (Tr. 27-80; see also Tr. 214-15). On January 13, 2015, ALJ Alger issued an unfavorable decision. (Tr. 7-21). On February 6, 2015, plaintiff filed his request for review of the hearing decision (Tr. 26), which the Appeals Council denied on March 23, 2015, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On May 19, 2015, plaintiff filed his complaint in this pending action (Dkt. #1), and on March 4, 2016, defendant filed her answer. (Dkt. #16; see also Dkts. ## 14-15).[3] On July 22, 2016, plaintiff filed his Motion for Order Reversing the Decision of the Commissioner, with brief in support (Dkt. #22; see also Dkts. ##18-21),[4] which was followed by defendant's Motion for an Order Affirming the Decision of the Commissioner and brief in support on October 20, 2016 (Dkt. #25; see also Dkts. ##23-24).

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner (Dkt. #22) is granted in limited part such that this case is remanded consistent with this Ruling, and defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #25) is denied.

---

[3]Attached to defendant's answer is the 998-page Administrative Transcript. There is a fair amount of duplication in the record.

[4]Plaintiff also filed a fifty-five page Statement of Material Facts (Dkt. #22-2), as to which defendant "generally agree[d,]" adding only a few additional facts. (Dkt. #25, Brief at 2-4). The Magistrate Judge thanks both counsel for preparing this useful stipulation.

## II. FACTUAL BACKGROUND

### A. HEARING TESTIMONY AND ACTIVITIES OF DAILY LIVING

At the time of his hearing,[5] plaintiff was fifty-three years old, unmarried, and had recently obtained an apartment in East Hartford after being homeless for years. (Tr. 40, 43, 218). Plaintiff lives by himself, does not drive, and takes the bus. (Tr. 41, 43). He graduated from high school and can read and write. (Tr. 40, 47-48). Plaintiff testified that due to his homelessness, he spends most of his time in the library and likes to read "poetry stuff, comic books, things like that[,]" but he could not remember the last book he read, although he thought it was a comic book. (Tr. 62-63).

Plaintiff began working when he was sixteen and testified that he has worked his entire life. (Tr. 49-50). Plaintiff testified that before 1999, he held many jobs, including making boilers, unloading and loading trucks at Staples, and performing heavy and light housekeeping and laundry duty at a nursing home. (Tr. 50-51). At Staples, plaintiff loaded and unloaded ten trucks in a shift and lifted somewhere between fifty and one hundred pounds for the entire shift. (Tr. 50-51, 66). Although plaintiff testified that he liked this job, the "position and the hours were terminated." (Tr. 51). Plaintiff worked full-time at a nursing home for three years, where he stripped and waxed floors using machinery and sorted, washed, dried, and folded laundry. (Tr. 51-52). Plaintiff "decided to leave[]" the company when it was sold and "they had to cut everybody's hours. . . ." (Tr. 52). Plaintiff testified that in 2010[6] he worked as a deli clerk at Stop & Shop for about

---

[5]Plaintiff's hearing commenced on September 2, 2014, at which time the ALJ postponed the hearing to give plaintiff additional time in which to find an attorney (Tr. 27-32); the hearing reconvened on December 16, 2014, by which time plaintiff was represented by his current counsel. (Tr. 33-80).

[6]Plaintiff later testified that this work was in 2009, not 2010. (Tr. 52).

"six months or so[]" until he cut his hand on a slicer and "actually just left" because he "didn't like the job anymore." (Tr. 40-41). At the hearing, plaintiff provided multiple explanations for why he did not go back to work. At times, plaintiff testified that he was unable to work because "with [his] body, it's all about wear and tear, and [he doesn't] have the strength anymore." (Tr. 41). At other times, plaintiff testified that his father's death in June 2010 was a turning point after which he did not have "a real job[]" because he and his father were extremely close. (Tr. 53, 55). And at still other times, plaintiff testified that he could not work because he "do[esn't] have a vehicle to [get] around[,]" but subsequently denied that he could work even if given transportation because his "body can't go through the wear and tear anymore." (Tr. 54).

Plaintiff testified that his most troubling medical issues are pain in his right hip and depression. (Tr. 41-42). Plaintiff testified that he has rheumatoid arthritis in his hip, for which he does not take any medication. (Tr. 42, 61). When asked how he was diagnosed with rheumatoid arthritis, plaintiff testified that his doctor tested for it by continually "hitting [him] with a little rubber hammer." (Tr. 61). Plaintiff's counsel asked if the "little rubber hammer" gave his doctor the answer "like a divining rod?" (Id.). Plaintiff answered, "Right." (Id.). Plaintiff testified that his hip prevents him from "bending, stooping down, and trying to do other things." (Tr. 62). He added that while sitting at the hearing, he was "feeling numb[]" and if "you see [him] kind of rotate a little bit . . . that means [he is] trying to ease up the pressure a little bit." (Id.). Plaintiff testified that he has to sit in "an upright chair[]" with a sturdy back. (Id.).

Due to his depression, plaintiff goes to group counseling at InterCommunity Health every Friday, which he finds helpful and enjoyable. (Tr. 42-43). Plaintiff takes one

medication for depression which he described as "[m]ostly" helpful, but he could not recall any details about his medication at the hearing. (Tr. 42-43). Plaintiff explained that after his father's death, he was "[v]ery much[]" distracted such that at "[c]ertain times, [he] cannot communicate with people and work at the same time[,]" and has "[a] little bit[]" of trouble concentrating because he is thinking too much and his brain is "full of ideas[.]" (Tr. 53). Plaintiff testified this was "[s]ome sort[]" of a problem with keeping jobs and getting tasks done with his caseworker. (Tr. 54). Plaintiff explained that it was hard for him to participate in his group therapy at first, but that after a while he was referred to a new therapy group for participants who experience psychosis. (Tr. 55-56). Plaintiff testified that this group "opened up a bigger door for him[,]" but denied that he experiences any psychosis. (Tr. 56). When counsel asked plaintiff why he was put in this therapy group if he did not have a similar condition, plaintiff responded "[b]ecause, they have the same type of problem, what I have, and they have a couple of more other things." (Id.). Plaintiff testified that he has problems with isolation, and there are times he does not want to see or hear from anyone and will "lock [him]self in a room [so that he does not] have to see or hear anyone at all[,]" going "maybe a day or two[]" without even going outside. (Tr. 56-57). Plaintiff added that he "still see[s] shadows . . . [e]very now and then." (Tr. 57). Although plaintiff at first denied it, plaintiff testified that his father still "c[a]me [to] visit" plaintiff after his father died, and plaintiff even saw "[a] couple[]" of other dead people. (Tr. 55).

Plaintiff admitted that he was very thin and that putting on weight "grosses [him] out[]"; he also testified that he washes himself every time he touches something, but denied that this was unusual. (Tr. 57). Plaintiff indicated that he "[does not] get to sleep

too often[,]" that sleeping "is a problem[,]" and that he sleeps on average "[p]robably[] two hours, maybe less, maybe a half hour[]" each night because he is "not comfortable." (Tr. 58). In this testimony, plaintiff referred to the fact that he did not have any furniture in his apartment, and slept on the floor. (Id.). When asked if he would sleep well if he had a bed, plaintiff testified that he believed he would still struggle to sleep because "so many different things . . . [are on his] mind, and [he] ha[s] to try to sort it, and [he's] trying." (Id.).

Plaintiff denied that mental health professionals have encouraged him to adjust his medication, but he testified that his dosage has been increased by one milligram, which he described as "pretty all right." (Tr. 59). Plaintiff explained that he takes his medication as instructed, but admitted that there was a time when he took his medication every other day to make it last longer because he could not remember to get refills. (Id.). When asked why his InterCommunity records noted that he had been drinking alcohol and smoking marijuana, plaintiff answered that such behavior "was a thing of the past," and he is "[a]bsolutely, positively, 100 percent sure[]" he has not done either since he left Manchester Hospital. (Tr. 63-64). Plaintiff presented to Manchester Hospital in 2012, and plaintiff testified that he was drunk at that time due to depression because his father died and "reality set in." (Id.).

Before plaintiff moved into the apartment in East Hartford, he was homeless for two years. (Tr. 43). At times, plaintiff lived in a homeless shelter, but at other times plaintiff lived on the street or in a park. (Tr. 43-44). Plaintiff testified that he did not always go to a shelter because he "never really had the – the know-how towards everything with a shelter. . . ." (Tr. 44). When asked why he did not get an apartment,

plaintiff testified that he "didn't have any money, any income, nothing." (Tr. 44-45). Plaintiff did not live with family or friends because "[t]hat's a hard thing to do, because everybody wants something." (Id.). Before becoming homeless, plaintiff testified that he had lived with "[p]robably [his] only friend[,]" but then was thrown out. (Tr. 45-46). At times during his adult life, plaintiff lived with his mother. (Tr. 46). The only time plaintiff lived on his own was about ten years earlier when he lived in a rooming house, and plaintiff explained that he never had his own residence "[b]ecause, [he] was busy, going from one place to the next, working-wise." (Id.).

Plaintiff testified that he has not cooked anything in "a long time" and feeds himself by buying "a sandwich here, a sandwich there[]" and drinking Ensure "to build up [his] immune system. . . . If [he] miss[es] a meal, [he] can drink this, and [he'll] be okay for a day." (Tr. 47). Because he does not eat regularly, plaintiff's weight fluctuates. (Id.).

Plaintiff received state benefits in the form of health insurance, cash assistance, and food stamps, mostly coordinated by Shawn Decker, his case worker at InterCommunity. (Tr. 43, 47-48). According to plaintiff, Decker helped plaintiff with many responsibilities, including accessing housing, getting bus passes, and managing his social services applications for food stamps and SAGA cash. (Tr. 47). Plaintiff testified that he was unable to do any of this himself because "most of the stuff, [he] do[es]n't understand." (Tr. 48). Plaintiff added that Decker had been trying to have plaintiff handle some of these responsibilities on his own, but that "[s]ome of it came out well, some didn't[.]" (Id.). Plaintiff had no furniture in his apartment and relied on Decker to "tak[e] care of that[.]" (Tr. 49). Plaintiff does not know how to use a computer. (Id.). Decker

makes sure plaintiff goes to his scheduled appointments, checks in to ensure that plaintiff is not suicidal, and has been "managing [plaintiff's] affairs[]" for two years. (Id.).

Decker testified at the hearing that he met plaintiff two years prior and generally communicates with plaintiff two or three times a week, either in person or by phone. (Tr. 67). Decker described that he does "pretty much everything[]" for plaintiff, including ensuring he takes his medication, going to his appointments, helping him get an apartment by bringing him to see it and signing the paperwork, and managing his entitlements. (Tr. 67-68). Decker indicated that he tried to encourage plaintiff to be more self-sufficient, but usually plaintiff would not complete assigned tasks and Decker would have to do them with plaintiff, or for him. (Tr. 70). Decker testified that plaintiff missed a deadline to submit information for his apartment application by three or four days, and that Decker had to call the East Hartford Housing Authority to get his application "put back in place[] so that he would be able to get this apartment[.]" (Tr. 71). Decker added that he had to obtain all the required documentation and bring it to the Housing Authority for plaintiff, because plaintiff "has a difficult time following through on everything[.]" (Id.). Decker testified that plaintiff avoids making phone calls because he is isolative, and plaintiff would often wait until meeting with Decker to bring up the need to make a phone call related to his benefits so that Decker would do it with him. (Tr. 71-72). Decker explained that he has to constantly prompt plaintiff to do things he should be able to do on his own, and that Decker believes plaintiff has trouble concentrating because in conversation, Decker "ha[s] to refocus [plaintiff] to what [they]'re talking about[.]" (Tr. 72-73). Decker testified that when he encouraged plaintiff to reach out to people in his life to help him acquire needed furniture and supplies for his new apartment, plaintiff

refused because he "doesn't like to reach out to anybody. He wants to kind of, just, stay to himself." (Tr. 73).

The vocational expert testified that plaintiff's past work as a store laborer was medium work likely performed at the heavy exertional level, and his work as both a hospital cleaner and a floor waxer was medium work. (Tr. 75-76). In response to the ALJ's hypothetical of a person limited to medium level work who could carry out and remember simple instructions, handle normal changes in the work place with no interaction with the general public and only occasional interaction with co-workers, the vocational expert testified that such a person would be able to do plaintiff's past work as a laborer in stores, at the medium level. (Tr. 76). In response to the same hypothetical, except that the person is limited to light level work, the vocational expert testified that such a person could not perform any of plaintiff's past work but could perform the job of a marker, routing clerk, or mail clerk. (Tr. 76-78). The vocational expert testified that no job could accommodate such a person who also was unable to maintain concentration such that he was off-task at least fifteen percent of the work day. (Tr. 78).

B. MEDICAL RECORDS

Plaintiff's medical records in the administrative transcript cover a twenty-eight month period within plaintiff's period of alleged disability, from September 2012 (Tr. 350-62) through December 2014 (Tr. 896-902).[7]

On September 29, 2012, plaintiff was admitted to the Emergency Department of Manchester Memorial Hospital ["MMH"] with suicidal thoughts. (Tr. 350-57). Plaintiff was

---

[7]While the Court has reviewed all of the medical records in the Administrative Transcript, the decision will not address medical records that do not relate to plaintiff's alleged causes of disability. (See, e.g., Tr. 363-64, 841-43 (uninterpreted lab results), 836-39 (acute bronchitis and pharyngitis)).

despondent and homeless, without much sleep; he admitted to consuming some alcohol that evening, and complained of bilateral leg pain from walking. (Id.). Plaintiff presented with a prescription for Abilify PO. (Tr. 351, 354). Dr. Jesse Fisk, an emergency room physician, described plaintiff as disheveled and despondent-appearing but alert, oriented, and in no apparent distress; plaintiff's physical exam was normal. (Tr. 351). Dr. Fisk noted that plaintiff could not be assessed at that time because he was intoxicated, "tearful[,] and had his hands covering his eyes as he rambled about life being unfair and doors closing and no others opening." (Tr. 353). Dr. Fisk diagnosed plaintiff with prolonged depression. (Tr. 352). Upon subsequent evaluation, Dr. Theodore Sherry, another emergency room physician, wrote that plaintiff was experiencing "psychiatric decompensation with worsening depression and thoughts of suicide, [and he] will remain overnight for crisis evaluation in the morning." (Id.).

Upon evaluation the following morning, Dr. Fisk found that plaintiff was "profoundly depressed," kept his eyes closed and head turned away, and was only able to answer questions with minimal information in barely audible speech. (Tr. 353). Plaintiff had been homeless for months, and reported going to a friend's home to borrow a gun to kill himself before he was sent to the Emergency Department. (Id.). Dr. Fisk noted that plaintiff reported he recently was connected by a homeless shelter to outpatient care at Community Health Resources ["CHR"]; Dr. Fisk contacted CHR to confirm plaintiff's medication and treatment history, noting that plaintiff had sought treatment on his own in August 2012, was evaluated for medication, and was prescribed Abilify 2mg by "S. Hinton" on September 11, 2012. (Tr. 353-54). Dr. Fisk reported that plaintiff was unable to sleep, lost his appetite, and lost more than twenty pounds in a few months; he had

suicidal ideation with intent and a plan; he could not reliably contract for safety; and he "sees and hears strange things[,]" and experiences auditory and visual hallucinations that come and go but are not distressing or disruptive. (Id.). Plaintiff exhibited underproductive speech; an indifferent attitude towards the examiner; cooperative behavior and organized thought processes; alert and oriented cognitive function; suicidal thought content; auditory and visual perceptual disturbances; depressed mood; flat and tearful affect; fair impulse control; poor insight; poor judgment; and suicidal risk factors including ideation, intent, plan, and inability to contract for safety. (Tr. 354-55). Dr. Fisk diagnosed plaintiff with depressive disorder, not otherwise specified, and rule out Schizoaffective disorder; he opined that plaintiff had a GAF score of 25. (Id.). Plaintiff was transferred to MMH Mental Health on September 30, 2012. (Tr. 358-62).

After his transfer, Dr. David Hedberg, a psychiatrist, performed another mental status examination during which plaintiff struggled to answer questions, presumably due to his depression; plaintiff discussed suicidal feelings but contradicted his statements from his admission the prior evening by denying that he had a suicidal plan. (Tr. 359). Dr. Hedberg opined that plaintiff's "concentration is only fair[.]" (Id.). Plaintiff stated that he heard voices, although not at that time, and he was unable to describe what the voices said. (Id.).

On October 3, 2012, Dr. Jamshid Marvasti, a psychiatrist, examined plaintiff and described him as a highly intelligent, charming young man who came to the emergency room asking for help because he is "falling apart, has no place to live, has no money and shelter would not accept him because he has been there too long." (Tr. 361-62). Dr. Marvasti's mental status evaluation did not reveal any indication of psychotic sickness or

organic mental disorder; plaintiff was cooperative, communicative, and informative; and plaintiff admitted to being anxious and depressed because he had no place to live. (Id.). Dr. Marvasti reported that within a short period of time, plaintiff improved substantially and requested to be discharged. (Id.). Dr. Marvasti discharged plaintiff but noted that he would be followed by Sharon Hinton, APRN, at CHR on October 16, 2012. (Id.).

Six months later, on April 1, 2013, plaintiff presented to Dr. Sultan Quraishi, a family physician, with depression. (Tr. 365-67, 373-75). Dr. Quraishi diagnosed plaintiff with dysthymic disorder and prescribed 20mg Lexapro, daily. (Tr. 365-66, 373-74). Eleven days later, on April 12, 2013, plaintiff returned to Dr. Quraishi with depression, and Dr. Quraishi added a current working diagnosis of "anxiety state unspecified." (Tr. 367-68, 375-76).  On May 7, 2013, plaintiff presented to Dr. Quraishi complaining of pain in his right hip. (Tr. 369-70, 377-78). Physical examination revealed tenderness over the right hip joint with painful and limited movement. (Id.). Dr. Quraishi diagnosed plaintiff with "osteoarthrosis localized not specified whether primary or secondary involving pelvic region and thigh (working)"; "pure hypercholesterolemia (working)"; "myalgia and myositis unspecified (working)"; and "dysthymic disorder (working)". (Tr. 370, 378). One week later, on May 14, 2013, plaintiff presented for a routine physical at which Dr. Quraishi described him as well-nourished with a comfortable appearance and demeanor, and plaintiff's exam was completely normal. (Tr. 371-72, 379-80).

On May 3, 2013, plaintiff was suicidal and presented at InterCommunity with depression that was "getting heavier and heavier." (Tr. 381-87, 847-53; see also Tr. 424-28). Gillian Workman-Stein, LCSW, reported that plaintiff had become increasingly depressed after he became homeless and lost his father, who was his primary emotional

support. (Tr. 384, 425, 850). Workman-Stein's mental status examination of plaintiff that day (Tr. 708-13) found that he was well-groomed and mildly thin, with clear speech and average demeanor, eye contact, and activity. (Tr. 708). Plaintiff's thought content exhibited mild paranoid delusions, and his thought process exhibited mild auditory and visual hallucinations but was generally logical. (Tr. 709). Plaintiff was moderately depressed, moderately anxious, had a full affect, behaved cooperatively, and exhibited moderate despair/worthlessness. (Tr. 710). Plaintiff exhibited mild impairment of his concentration/attention, average estimated intelligence, and fair insight and judgment. (Tr. 711). Workman-Stein noted that plaintiff's depressed mood was evidenced by hospitalization, low motivation, low energy, feelings of worthlessness and "a lot" of suicidal thoughts; plaintiff's anxiety was evidenced by daily worry, racing thoughts about the future, and one panic attack. (Tr. 382, 711, 848). Plaintiff experienced sleep problems such that sometimes he does not sleep at all, and reported sometimes "you see something that you think is there but it is not." (Tr. 383, 849). Workman-Stein noted that plaintiff has a disturbed reality as evidenced by visual hallucinations, paranoia with respect to others putting thoughts in his head, and possibly hearing things, but it is "[u]nclear if psychosis or if there is a malingering quality[.]" (Id.).

Workman-Stein opined that plaintiff had major depressive disorder, single episode, moderate, but rule out severe with psychotic features; plaintiff had severe housing problems, severe occupational problems, and severe problems with primary support group; and plaintiff had a current GAF score of 43. (Tr. 385, 426, 851). Plaintiff expressed interest in any behavioral health clinical and rehabilitative services offered to him, and

agreed to participate in a weekly therapy group for depression/anxiety, but was not interested in medication. (Tr. 384, 386, 425, 427, 850, 852).

In May 2013 plaintiff began participating in the InterCommunity Depression and Anxiety Therapy Group, led by Vivian Carr-Allen, LCSW.[8] Plaintiff did not participate in the first two sessions, and after the second session Carr-Allen referred plaintiff for a crisis evaluation because he exhibited a flat affect and was non-responsive when called upon. (Tr. 533-36). Workman-Stein performed the crisis evaluation (Tr. 448-52) and described plaintiff as friendly and well-spoken, but overwhelmed by his physical needs and lack of housing support. (Tr. 450). Plaintiff was not interested in offers of shelter and was "contemplative about hospital stating he is not suicidal, doesn't sleep there anyway and feels more confined and increasingly frustrated." (Id.). In later sessions of the Anxiety and Depression Psychotherapy Group, Carr-Allen reported that plaintiff asked not to participate but demonstrated a better affect (Tr. 541-42); was attentive but reported that things were not good and rated his depression as a ten (Tr. 543-44); and actively participated with brighter affect but rated his depression as a ten (Tr. 549-50).

Plaintiff began individual psychotherapy with Carr-Allen on June 10, 2013 with a goal of returning to baseline functioning with his depression; he rated his depression as a ten, and reported daily suicidal thought as well as feeling as if he is "losing it." (Tr. 593-95). In group therapy plaintiff continued to rate his depression at a ten and was attentive

---

[8]There are two types of reports from group psychotherapy sessions in the record: one with plaintiff's name on the bottom, that gives comments specific to plaintiff's engagement with that session, and two, reports that do not specifically name plaintiff and give more general comments about the group in each session. (See, e.g., Tr. 537-40, 545-48, 551-52, 555-58, 565-66, 718-19, 726-27, 738-39).  Although all the records have been reviewed, psychotherapy notes from the latter category of reports will not be specifically cited.

but generally did not participate, although he did participate in some role playing. (Tr. 553-54, 557-60, 563-64, 724-25).

In July 2013, InterCommunity paired plaintiff with Decker, a case worker, to help plaintiff complete a Housing and Urban Development ["HUD"] packet. (Tr. 453-57). Decker assisted plaintiff on a regular basis by helping plaintiff obtain documents for his HUD application (Tr. 458-59), reapply for disability (Tr. 460-61), gather disability and housing paperwork (Tr. 462-63), obtain bus passes (Tr. 464-65), and check the status of various benefits. (Tr. 466-69).

Carr-Allen evaluated plaintiff on August 5, 2013 (Tr. 388-91, 572-75, 854-57) because he continued to have no energy or motivation; she assigned plaintiff a GAF score of 36. (Tr. 388, 390-91, 572-75, 854, 856-57). Plaintiff continued to not participate in group therapy, showed poor comprehension of concepts covered in the session, and told Carr-Allen privately that "things were not good" and he had "too much going on to participate in the anxiety and depression group." (Tr. 596-98, 728-29). Decker had reported to Carr-Allen that plaintiff was unable to follow through on what Decker recommended and seemed to want Decker to do everything for him. (Tr. 597).

Two days later on August 16, 2013, Marina Sciucco, APRN, performed a medical evaluation at the suggestion of plaintiff's therapist because he was depressed, exhausted, hopeless, not sleeping, experiencing mild thought derailment, and had a poor appetite. (Tr. 392-97, 614-19, 903-08). APRN Sciucco recorded that plaintiff lost twenty-three pounds in eight months. (Tr. 392, 614, 903). APRN Sciucco performed a mental status exam, noting that plaintiff was dressed appropriately and had hygiene that was "surprisingly very good considering his living in the park[,]"; he had a steady gait and

clear speech with normal rate and rhythm; he was pleasant, engaging, and had good eye contact; he was alert and fully oriented; he had thoughts that were at times illogical with some derailment; he exhibited no aggression, psychosis, or suicidal or homicidal ideation, but had a sad affect with mild constriction; and he exhibited no abnormal involuntary movements or distractability. (Tr. 392-95, 614-17, 903-06).

On September 5, 2013, plaintiff told Carr-Allen that his appetite was so diminished that he was eating three or four bites of food per day; he was tired with little interest or motivation; he was not sleeping; and he had suicidal thoughts off and on. (Tr. 603; see Tr. 602-04). In therapy on September 19, 2013 (Tr. 605-06), plaintiff agreed to consider the SECURE Intensive Outpatient Program ["IOP"]. (Tr. 606). APRN Sciucco met with plaintiff on September 24, 2013 to evaluate his prescription (Tr. 398-403, 620-25, 909-14); at that time plaintiff still had some Invega pills left even though he should have run out of his prescription nine days earlier. (Tr. 398, 620, 909).  APRN Sciucco opined that plaintiff could benefit from an increase in medication dosage, but plaintiff refused. (Tr. 399, 621, 910).

On October 2, 2013, Decker noted plaintiff has "a hard time fighting through [his depression] to get his work done." (Tr. 520; see Tr. 520-23). Decker continued to help plaintiff check the status of his benefits and obtain bus passes. (Tr. 474-79). Decker also accompanied plaintiff to therapy, where he and Carr-Allen encouraged plaintiff to begin IOP treatment. (Tr. 480-81, 608-13). On October 28, 2013, Heidi Friedland, LCSW, assessed plaintiff because he was attending therapy but not making progress. (Tr. 567-71). Plaintiff reported auditory and visual hallucinations, had not eaten in days, and said he has "felt depressed every day of [his] life [and is] worried all the time." (Tr. 567).

Plaintiff experienced anxiety, disorganized and depressed mood, and poor eating and sleeping, which were constantly present. (Id.). Friedland described plaintiff as "highly tangential[,]" and noted that when asked about the level of intensity of his symptoms, plaintiff was unable to rate them. (Tr. 567-68). Plaintiff reported experiencing both auditory and visual hallucinations all the time, "but they do not appear unmanageable today." (Tr. 568). In light of plaintiff's difficulties expressing himself, Friedland recommended that plaintiff join another small group for individuals with persistent mental illness. (Id.).

APRN Sciucco examined plaintiff for a medication refill on October 30, 2013 (Tr. 404-09, 622-31, 915-20), and again encouraged him to increase his medication dosage; plaintiff declined. (Tr. 404, 626, 915). Plaintiff had a stable mood and improved appetite with gradual weight gain, although he was still very thin. (Id.). APRN Sciucco evaluated plaintiff for another medication refill on December 5, 2013 (Tr. 410-15, 632-37, 921-26), and plaintiff again refused an increase in dosage but reported he was taking the medication more consistently. (Tr. 410, 632, 921). Plaintiff had a stable mood but poor appetite and had lost three pounds since his previous visit. (Id.).

In November 2013, plaintiff began participating in the Moving Forward Therapy Group for participants experiencing "symptoms of schizophrenia, schizoaffective disorder, bipolar disorder, and depression with psychosis." (Tr. 734-35, 760-61).[9] Mary Salustri, LCSW, reported that plaintiff appeared at ease with this group and actively participated,

---

[9]As in note 8 supra, there are two types of notes from the Moving Forward Therapy Group. Although all group therapy notes have been reviewed, session notes that do not specifically reference plaintiff will not be discussed. (See, e.g., Tr. 738-39).

but he shared a lot of off-topic information. (Tr. 734-35). In group session on November 15, Salustri described plaintiff as "tangential" and plaintiff insisted that there was

> nothing that he can change or wants to change in his life. [Plaintiff] appears to be pre contemplative regarding all potential changes in behavior. [Plaintiff] did express that he was happy to be in the group and that it feels good to be around other people and to have people listen to him when he talks.

(Tr. 740-41). After session on November 22, Salustri opined that plaintiff was making progress in understanding his illness because he told the group, "I see people running by men [sic] that aren't there. When things don't go my way I shut the world out." (Tr. 744-45). On December 13, 2013, Salustri reported that plaintiff actively participated in group therapy with good comprehension, and plaintiff observed that he was better able to manage heated situations and that his medication was helping him have clear thoughts. (Tr. 746-47). On December 27, Salustri reported that plaintiff avoided discussing his mental illness in group therapy even when asked direct questions and wanted to focus on his physical illness instead. (Tr. 752-53). Salustri reported that on January 10, 2014, plaintiff actively participated in group therapy with good comprehension of the topic, which was understanding mental illness, and noted that he had thoughts that people in the television are watching him; he also reported that he was getting better at taking care of his needs at the shelter by asking for the space he needs. (Tr. 754-55). Salustri reported that in session the following week plaintiff continued to actively participate and reported he was getting better at being able to cope with his symptoms. (Tr. 758-59).

Decker continued to assist plaintiff to obtain bus passes, understand the Social Security Disability process, acquire more intensive services, complete paperwork and medical forms for his Social Security application, and check the status of his benefits. (Tr.

482-97). On May 3, 2013, Decker performed a mental status examination during which he described plaintiff's current mental status as flat and depressed, and noted that plaintiff isolates and does not leave his home. (Tr. 416-19). Plaintiff appeared clean, his cognitive status was fine, and he exhibited normal speech, depressed mood, flat affect, limited judgment, and limited insight. (Tr. 416-17). Decker opined that plaintiff had a slight problem with personal hygiene, caring for physical needs, using good judgment regarding safety and dangerous circumstances, and using appropriate coping skills to meet ordinary demands of a work environment; Decker further opined that plaintiff had a serious problem with handling frustration appropriately, interacting appropriately with others in a work environment, asking questions or requesting assistance, respecting/responding appropriately to others in authority, and getting along with others without distracting them or exhibiting behavioral extremes. (Tr. 417-18). Decker found that plaintiff had a slight problem with carrying out single-step instructions; plaintiff had an obvious problem with carrying out multi-step instructions, focusing long enough to finish assigned simple activities or tasks, changing from one simple task to another, or performing basic work activities at a reasonable pace/finishing on time; and plaintiff had a serious problem performing work activity on a sustained basis (i.e., eight hours per day, five days a week). (Id.).

Plaintiff continued to participate in the Moving Forward group through January and February 2014. (Tr. 764-67, 772-73, 776-78). Salustri opined that plaintiff's understanding of his illness had increased a little as a result of participation in group therapy; plaintiff reported seeing shadows of people who are not there a few times per day and reported auditory hallucinations once a week; and plaintiff experienced low

motivation and low energy. (Tr. 581, 863; see Tr. 581-86, 863-68). Salustri performed an evaluation of plaintiff's capability for activities of daily living, and opined that plaintiff had moderately severe impairment or problems functioning with respect to health practices, housing stability, communication, safety, managing time, managing money, nutrition, problem solving, family relationships, leisure, community resources, social network, productivity, and coping skills. (Tr. 583-84, 865-66). Salustri opined that plaintiff had moderate impairment or problems with respect to alcohol/drug usage, behavioral norms, personal hygiene, grooming and dress. (Id.). Salustri opined that plaintiff had mild impairment, within normal limits, with respect to sexuality, maintaining appropriate behavior towards others, and respecting the privacy and rights of others. (Id.). Salustri changed plaintiff's Axis I diagnosis to major depressive disorder, recurrent, severe with psychotic features, with a GAF score of 33. (Tr. 584-85, 866-67).

On February 6, 2014, plaintiff presented to APRN Sciucco for a refill of medication of which he ran out one month earlier. (Tr. 638-44, 927-33).  Plaintiff had a stable mood and his appetite had improved such that he gained four pounds since his previous visit; he still was not sleeping well and had not been able to avail himself of social services or case management enough to help him achieve a more stable living situation. (Tr. 638, 927). APRN Sciucco described plaintiff as "depressed due to severe psychosocial stress of being homeless but also exhibits some odd thought patter[n]s suggestive of a possible thought disorder." (Tr. 639, 928).  On February 28, 2014, APRN Sciucco reported that plaintiff's mood was stable and he had odd thought patterns suggestive of a possible thought disorder but that plaintiff is "[p]resenting as more coherent as I get to know him."  (Tr. 645-46, 934-35; see Tr. 645-50, 934-39). In April 2014, APRN Sciucco

observed symptoms of flat affect, severe weight changes, thought errors, and depression. (Tr. 652, 941; <u>see</u> Tr. 651-56, 940-45). Plaintiff continued to actively participate in the Moving Forward therapy group, where he mentioned seeing and hearing things that others do not (Tr. 772-73) and described himself as "lucky" that there are "[n]o voices at this time." (Tr. 776-77). Plaintiff listened to other group members share their experiences with psychotic symptoms and indicated that he knows how they feel. (Tr. 778-79). In a session on March 7, 2014, plaintiff reported that he was in a lot of physical pain, which was making his depression worse. (Tr. 782-83).

In therapy in April 2014, plaintiff told the group that at times he thought he could read minds, or "feel[s] like hands are around [his] neck or [] feel[s] breath on the back of [his] neck[.]" (Tr. 794-95, 800-01). During April 2014, Decker helped plaintiff arrange a meeting with a doctor after plaintiff missed a scheduled doctor's appointment. (Tr. 502-05). In May 2014 Decker helped plaintiff schedule a doctor's appointment because plaintiff had received a call to do so but had not tried to return the phone call. (Tr. 506-07).

On April 29, 2014, Decker completed a Client's Assessment of Strengths, Interests and Goals (CASIG 2.2.1) for plaintiff. (Tr. 429-47). Plaintiff had very serious concerns about his living situation. (Tr. 430). Plaintiff required "standby assistance"[10] in describing how to plan meals with a healthy balance of foods, prepare meals, or prepare to go grocery shopping. (<u>Id.</u>). Plaintiff could independently describe how to make a bed or change sheets, wash clothes, or locate a needed phone number. (Tr. 430-31). Plaintiff

---

[10]"Standby Assistance" is defined in the form as follows: "Supervision by one individual is needed to enable the individual to perform new procedures for safe and effective performance. Cues- Visual demonstrations related to the task. Prompts/coaching- Visual and physical directions that prompt the participant to perform the skills and/or tasks." (Tr. 429).

could independently describe general grooming and hygiene, how he would dress in specific weather or for a doctor's appointment, and discuss daily dental care and general dental care; plaintiff answered that he wears clean clothes. (Tr. 431-32). Plaintiff stated that he had no concerns about his ability to manage safety issues; he could independently describe how to get help in an emergency, describe his understanding of common dangers in an apartment, describe common dangers in the community, and describe how to contact his landlord in an emergency.[11] (Tr. 432-33). Plaintiff was able to "independently" answer if in the past three months he had used street drugs, if he has consumed enough alcohol to get drunk at least once a month, if he has hurt someone in the past three months, if he has hurt himself or attempted suicide in the past three months, and if in the past three months he has engaged in unprotected sexual activity. (Id.). Plaintiff was "somewhat happy" with his ability to manage money. (Tr. 434). Plaintiff's only income was $216.00 per month in SAGA cash, and he did not have a housing subsidy to assist with rent. (Id.). Plaintiff could independently describe his understanding of setting up and using a checking account, describe how to keep money in a safe place, and describe how to manage his money. (Id.). Plaintiff required "standby assistance" to describe how to get and/or update valid identification. (Id.). Plaintiff was "very happy" with his knowledge or ability to use transportation programs. (Tr. 435). Plaintiff could independently describe how to access and use public transportation, and describe how to schedule a medical cab. (Id.).

Dr. Quraishi examined plaintiff on May 14, 2013, at which time he noted that plaintiff had a comfortable demeanor; plaintiff's examination was normal. (Tr. 829-30).

---

[11]Plaintiff was homeless and thus would not have had a landlord at this time.

The next day, on May 15, 2013, plaintiff's chest, right elbow and right hip were X-rayed. (Tr. 826, 840, 844). Plaintiff's chest X-ray was normal. (Id.). No fracture, dislocation or joint effusion was seen in plaintiff's right elbow, but there were small spurs involving the coronoid and olecranon processes consistent with minor degenerative changes. (Id.). No fracture or dislocation was seen in plaintiff's right hip, but there was a small marginal osteophyte at the base of the femoral head laterally, with no significant joint space narrowing or other degenerative changes. (Id.). The radiologist's impression was that there was no acute cardiopulmonary process in the chest and that there were minor degenerative changes in the right elbow and hip. (Id.).

In May 2014, Salustri noted that plaintiff was experiencing low motivation and energy, saw shadows of people who are not there a few times per week and experienced auditory hallucinations once a week. (Tr. 587, 869; see Tr. 587-92, 869-74). Salustri opined that plaintiff had "moderately sever[e] impairments or problems in functioning" with respect to health practices, housing stability, communication, safety, managing time, managing money, problem solving, family relationships, leisure, community resources, social network, productivity, and coping skills. (Tr. 589-90, 871-72). Salustri opined that plaintiff had "moderate impairment or problems in functioning" with respect to nutrition, behavioral norms, personal hygiene, grooming, and dress. (Id.). Salustri also opined that plaintiff had mild impairment, within normal limits, with respect to sexuality, maintaining appropriate behavior towards others, and respecting the privacy and rights of others. (Tr. 590, 872).

On June 8, 2014, plaintiff presented to Dr. Quraishi with complaints of right hip pain. (Tr. 832-33). Musculoskeletal examination revealed tenderness over the right hip

joint with painful and limited movement. (Id.). Dr. Quraishi opined that plaintiff had "osteoarthrosis localized not specified whether primary or secondary involving pelvic region and thigh." (Id.). Dr. Quraishi prescribed Duexis 800-26.6 MG oral tablets, three times daily. (Tr. 833).

On June 17, 2014, Decker perfomed a ninety day review of plaintiff's treatment and recovery plan. (Tr. 524-30). Plaintiff had been compliant with meeting his case worker, medication management, and attending therapy appointments; he was in the process of looking for housing and applying for disability benefits, and Decker wrote that plaintiff "has been able to do the majority of the work [for his Social Security application] on his own with minimal assistance from [Decker]." (Tr. 524). Plaintiff's depression continued to isolate him and make it difficult for him to stay motivated and follow up on his goals, but plaintiff was able to keep track of his Social Security paperwork. (Id.). Decker opined that plaintiff had moderately severe impairment or problems in functioning with respect to the following: taking care of health issues; maintaining stable housing, organizing possessions, abiding by rules and contributing to maintenance if living with others; listening to people, expressing opinions/feelings, making wishes known effectively; safely moving about the community and making safe decisions; following a regular schedule for bedtime, wake-up, mealtimes, and rarely being tardy or absent for work, day programs, appointments, or scheduled activities; managing money wisely and controlling spending habits; resolving basic problems of daily living and asking questions for clarity and setting expectations; getting along with family; utilizing community resources; engaging in leisure activities; productivity; and coping skills. (Tr. 527-28). Decker concluded that plaintiff had moderate impairment with respect to, and could some

of the time, eat at least two basically nutritious meals daily, comply with behavioral norms, and care for his personal hygiene, grooming, and dress. (Id.). Decker opined that plaintiff's ability to avoid alcohol and drug use and maintain appropriate behavior towards others, respect privacy, and practice safe sex or abstain, was within normal limits. (Tr. 528).

On July 10, 2014, plaintiff presented for a walk-in assessment due to hip pain at Silver Lane Medical Group, where he saw Dr. Misbah Vahidy. (Tr. 834-35). The musculoskeletal examination found tenderness over plaintiff's right hip joint with painful and limited movement. (Tr. 834). Plaintiff's Duexis prescription was continued. (Tr. 835).

In July 2014, Decker helped plaintiff meet with an attorney, obtain medical records, and complete paperwork for his disability application. (Tr. 510-19). Plaintiff presented at InterCommunity for a medication encounter on August 28, 2014 (Tr. 875-81), and reported to APRN Sciucco that he was taking his medication every other day and experiencing more difficulty sleeping and moderately severe changes in mood. (Tr. 875). Plaintiff had lost six pounds since his previous visit. (Tr. 876). His mood was euthymic, his affect congruent, orientation 3x, thought process logical with no abnormal thoughts, and memory and judgment marked as strengths. (Id.). APRN Sciucco assigned plaintiff a GAF score of 35. (Tr. 878). Plaintiff presented for another medication encounter on September 30, 2014 (Tr. 882-88), at which time he was satisfied with his medication, had gained six pounds since his previous visit, and exhibited euthymic mood, congruent affect, 3x orientation, logical thought processes, and no abnormal thoughts. (Tr. 882-83). Plaintiff had another medication encounter on October 29, 2014 (Tr. 889-95), at which time he was satisfied with his medication, had gained one pound since his previous visit, and

exhibited euthymic mood, congruent affect, logical thought processes, and no abnormal thoughts. (Tr. 889-90). At the next medication encounter on December 1, 2014 (Tr. 896-902), plaintiff again reported to APRN Sciucco that he was satisfied with his medication but he was taking it every other day toward the end of the prescription in order to bridge him until his next visit. (Tr. 896). Plaintiff gained two pounds since his previous visit, had a euthymic mood, congruent affect, 3x orientation, logical thought processes, and no abnormal thoughts. (Tr. 897). Plaintiff's attention/concentration, memory and judgment were marked strengths, and his diagnostic formulation remained the same. (Tr. 899).

The record also includes evaluations performed on behalf of the State of Connecticut in the scope of a Title XIX determination. (Tr. 958-62). For a determination dated June 30, 2014, a case worker found that plaintiff was not disabled, but was limited due to major depression; his depression caused "issues leaving home . . . for days at a time," and "prevented him from going out in public," and plaintiff had moderate to marked limitations in concentration, moderate limitations in adaptation and social interaction, and marked restriction in his ADLs. (Tr. 959). The examiner found that plaintiff did not have the mental capacity to perform unskilled work activity. (Id.).  A determination on August 31, 2015 found that plaintiff had been disabled due to Major Depressive Disorder since May 3, 2013, with limitations including isolating himself for days at a time, markedly limited ADLs, moderate limitation in adaptation and social interaction, and moderate to marked limitation in concentration. (Tr. 958).

C. MEDICAL OPINIONS/EXAMINATIONS

On May 23, 2012, plaintiff underwent an internal medicine consultative examination by Dr. James Ryan, at which time plaintiff's chief complaints were an inability

to stand for lengthy periods of time, chronic bronchitis, and left arm pain. (Tr. 344-49). Plaintiff claimed he was capable of walking thirty minutes before he started to experience numbness and pain in the right hip, as well as a "pins and needles" sensation; he could stand for about two minutes before having to move around and he could lift thirty to forty pounds with his right arm. (Tr. 345). Plaintiff was alert, cooperative, and oriented to time, person, and place during the exam; plaintiff had a normal gait and did not use an assistive device; and plaintiff had a BMI of approximately nineteen, which is borderline normal weight. (Tr. 347). Dr. Ryan's examination of plaintiff's skin, HEENT, neck, thorax, lungs, heart, abdomen, peripheral vasculature, neurological system, motor system, sensory system, and mental status were normal. (Tr. 347-48).

Dr. Ryan's musculoskeletal exam recorded no joint deformities; limited forward bending of the lumbosacral spine due to pain in the right hip; limited squatting to twenty degrees due to back and knee pain; normal Romberg; point tenderness over the right patellar region; point tenderness in the left arm with abduction, adduction, and internal rotation of the arms; pain in the left arm with resistance to flexion and extension; and tenderness to palpation over the left lateral and medial epicondyle as well as the olceranon in the left upper extremity. (Tr. 347-48). Plaintiff's remaining ranges of motion were within normal limits and he exhibited a normal gait, but his knee bends were limited to twenty degrees. (Tr. 348). Plaintiff's right patellar reflex was diminished, although the remaining deep tendon reflexes were bilaterally equal within normal limits. (Id.).

Dr. Ryan's impressions were that plaintiff has probable right hip arthritis or bursitis, and lateral and medial epicondylitis on the left as well as olecranon tenderness on the left, possible olecranon bursitis or tendinitis. (Id.). Dr. Ryan opined that plaintiff

"would have limitations performing work-related activities that require walking, lifting and carrying objects, and standing, and travel . . . [but] does not appear to have limitations grasping and manipulating objects, hearing, and speaking." (Tr. 349).

On June 18, 2014, Dr. Robert Dodenhoff performed a consultative examination of plaintiff. (Tr. 420-23). Dr. Dodenhoff did not find anything abnormal upon examination of plaintiff's skin, HEENT, neck, chest and lungs, heart, abdomen, peripheral pulses, and extremities. (Tr. 420). Dr. Dodenhoff opined that plaintiff's shoulders, elbows, wrists and hands were within normal limits bilaterally; his grip strength, fine and gross manipulation bilateral hands were within normal limits; his strength, muscle bulk, and tone in all four extremities were within normal limits; his pelvis, knees, ankles and left hip were within normal limits; but examination of his right hip revealed discomfort with ab/adduction and flexion/extension. (Tr. 420-21). Dr. Dodenhoff noted that plaintiff's gait was slightly antalgic and he used a cane with his right hand, but plaintiff did not require assistance getting on and off the examining table. (Tr. 421). Dr. Dodenhoff's mental status observation was that plaintiff was alert and oriented, exhibited appropriate mood and affect, and exhibited no loosening of associations, no flight of ideas, and no suicidal or homicidal ideations. (Id.). Dr. Dodenhoff opined that plaintiff is able to sit, lift, and handle objects; his speech and hearing are intact; he is able to understand, remember and carry out instructions; and he should be able to respond appropriately to supervision, coworkers, and the pressures of a work setting. (Id.).

On November 15, 2013, Dr. Barbara Coughlin, a non-examining State-agency physician, completed a Physical Residual Functional Capacity Assessment of plaintiff in which she opined that plaintiff can occasionally lift and/or carry up to fifty pounds and

frequently lift and/or carry up to twenty-five pounds; plaintiff can stand, walk and/or sit for six hours in an eight hour workday; climb ramps/stairs frequently; climb ladders/ropes/scaffolds occasionally; and crawl frequently. (Tr. 89-90). On June 24, 2014, Dr. Jeanne Kuslis reached the same conclusions as Dr. Coughlin, and opined that there is no evidence to support limitations claimed by plaintiff or Dr. Quraishi because the objective evidence shows only mild degenerative changes in his right hip. (Tr. 115-16).

On October 15, 2013, Dr. Hedy Augenbraun, Ph.D., a non-examining State-agency psychological consultant, completed a Mental Residual Functional Capacity Assessment in which she opined that plaintiff is moderately limited in his ability to: understand and remember detailed instructions; maintain attention and concentration for extended periods; carry out detailed instructions; complete a normal workday and workweek without interruption from psychologically based symptoms; interact appropriately with the general public and to get along with coworkers without distracting them or exhibiting behavioral extremes; and to set realistic goals or make plans independently of others. (Tr. 90-92). Dr. Augenbraun opined that plaintiff is "able to understand, remember, [and] carry out simple [two to three] step tasks," (Tr. 91) but is "[n]ot suited to close work with the public or close collaboration with others. Generally can relate adequately for task purposes if contacts brief and superficial." (Tr. 91-92). According to Dr. Augenbraun, plaintiff could "benefit from support for planning and goal-setting." (Tr. 92). On April 10, 2014, Dr. Therese Harris, Ph.D., reached the same conclusions as Dr. Augenbraun, except with respect to plaintiff's social limitations; Dr. Harris opined that plaintiff is markedly limited in his ability to interact appropriately with the general public, and is moderately limited in the ability to accept instructions and respond appropriately to criticism from

supervisors or get along with coworkers or peers without distracting them or exhibiting behavior extremes. (Tr. 116-18).

### III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. See 42 U.S.C. § 405(g); see also Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

<u>IV. DISCUSSION</u>

Following the five step evaluation process,[12] ALJ Alger found that plaintiff remains insured under the Social Security Act through June 30, 2015 (Tr. 12), and has not engaged in substantial gainful activity since December 19, 2011 (id., <u>citing</u> 20 C.F.R. §§ 404.1571 <u>et seq.</u> and 416.971 <u>et seq.</u>). The ALJ concluded that plaintiff has the severe impairments of "arthritis of the right hip and an affective disorder[,]" (Tr. 13, <u>citing</u> 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but that through his date last insured, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-15, <u>citing</u> 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). At step four, the ALJ found that plaintiff had the residual functional capacity ["RFC"] to perform medium work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(c), except that plaintiff is limited to simple, routine, and repetitive tasks in an environment that does not require any interaction with the general public, although

_____

[12]An ALJ determines disability using a five-step analysis. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920(a). First, the ALJ must determine whether the claimant is currently working. <u>See</u> 20 C.F.R. §§ 404.1520(a) and 416.920(a)(4)(i). If the claimant is currently employed, the claim is denied. <u>Id.</u> If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987); <u>Balsamo</u>, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); <u>see also Balsamo</u>, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. <u>See Balsamo</u>, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); <u>see also Balsamo</u>, 142 F.3d at 80 (citations omitted).

plaintiff can tolerate occasional interaction with coworkers and normal changes in the workplace. (Tr. 15-19). The ALJ concluded that through his date last insured, plaintiff was unable to perform any of his past relevant work (Tr. 19, citing 20 C.F.R. §§ 404.1565 and 416.963), but that jobs existed in significant numbers in the national economy that plaintiff could have performed (Tr. 20, citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)). Accordingly, the ALJ concluded that plaintiff has not been under a disability from December 19, 2011 through the date of the decision. (Tr. 20-21, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on the grounds that the ALJ's RFC assessment was not supported by substantial evidence (Dkt. #22, Brief at 2-10) and failed to incorporate all limitations caused by plaintiff's medically determinable impairments (id. at 11-12); the ALJ's step five finding was not supported by substantial evidence (id. at 10-11); the ALJ failed to give controlling weight to plaintiff's treating source reports (id. at 12-16); the ALJ erred in his credibility assessments (id. at 16-18); and the ALJ failed to satisfy plaintiff's right to due process and a full and fair hearing (id. at 18-19). Defendant counters that substantial evidence supported the ALJ's RFC finding (Dkt. #25, Brief at 6-10) and step five finding (id. at 10-12); the ALJ properly evaluated medical source opinions (id. at 12-14); and the ALJ correctly assessed the credibility of plaintiff and his case worker (id. at 14-15).

A. DEVELOPMENT OF THE RECORD

Before determining whether the ALJ's findings are supported by substantial evidence, the Court "must first be satisfied that the claimant has had a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act."

Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)(internal quotations omitted), abrogation on other grounds recognized by Desane v. Colvin, No. 3:15 CV 50 (GTS), 2015 WL 7748877, at *4 (N.D.N.Y. Nov. 30, 2015). Unlike adversarial proceedings, Social Security disability determinations are "investigatory, or inquisitorial," and the ALJ has a "duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." Moran v. Astrue, 569 F.3d 108, 112–13 (2d Cir. 2009), citing Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004). "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty . . . exists even when . . . the claimant is represented by counsel." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999), citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). "[W]here the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." Butts, 388 F.3d at 385 (citation omitted). Furthermore, "[t]he duty to develop the record is heightened in cases where the claimant is mentally impaired." Robinson v. Colvin, No. 14 CV 1227 (HBF), 2016 WL 7668439, at *6 (D. Conn. Dec. 20, 2016), citing Dervin v. Astrue, 407 F. App'x 154, 156 (9th Cir. 2010), Magistrate Judge's Recommended Ruling approved and adopted absent objection, No. 3:14 CV 1227 (MPS), 2017 WL 80403 (D. Conn. Jan. 9, 2017). Before determining that an individual is not disabled, the SSA "shall develop a complete medical history of at least the preceding twelve months. . . . ." 42 U.S.C. § 423(d)(5)(B). In a subsection titled "Our responsibility," the Social Security regulations elaborate:

> Before we make a determination that you are not disabled, we will develop your complete medical history for at least the [twelve] months preceding the month in which you file your application . . . unless you say

that your disability began less than [twelve] months before you filed your application.

20 C.F.R. §§ 404.1512(d) and 416.912(d).

Plaintiff filed his application on July 23, 2013 alleging disability due, in part, to depression (Tr. 218-21, 222-29); accordingly, defendant was obligated to develop plaintiff's complete medical history from at least July 2012 onward. 20 C.F.R. §§ 404.1512(d) and 416.912(d). The record, however, references treatment for which there are no corresponding medical records. Records from plaintiff's 2012 hospitalization for "psychiatric decompensation with worsening depression and thoughts of suicide[]" (Tr. 352) refer to psychiatric treatment plaintiff was receiving in August and September 2012 at CHR. (Tr. 352-64). According to Dr. Fisk's treatment notes, plaintiff presented to MMH with a prescription for Abilify, an antipsychotic, and Dr. Fisk called CHR to confirm that plaintiff was receiving mental health treatment at CHR and had been prescribed Abilify by "S. Hinton." (Tr. 353). Even when plaintiff was discharged from MMH, Dr. Marvasti noted that plaintiff "will be followed up by Sharon Hinton, APRN at CHR and has an appointment on 10/16/2012." (Tr. 362). The administrative record, however, does not include any records associated with mental health treatment at CHR.

SSA guidelines provide that when the report of a current treating source discloses other sources of medical evidence not previously reported, "these sources should be contacted, since it is essential that the medical documentation reflect all available sources, particularly in instances of questionable severity of impairment or inconclusive RFC." SSR 85-16, 1985 WL 56855, at *3 (S.S.A. 1985). Moreover, U.S. Magistrate Judge Fitzsimmons in this district previously found that when a plaintiff testified to serial homelessness and use of the emergency room for prescription refills, the absence of

records of this emergency room treatment triggered an obligation for the ALJ to make efforts to obtain these records, if they exist. <u>Robinson</u>, 2016 WL 7668439, at *6 . The obligation of the ALJ to develop a claimant's medical records is especially important in cases such as this because the Court has recognized that "[p]overty . . . and homelessness [are] also . . . significant contributing factor[s] in accessing care and treatment records." <u>Id.</u> (footnote omitted), <u>citing Shultz v. Astrue</u>, 362 F. App'x 634, 636 (9th Cir. 2010). In light of the need to reconsider evidence of plaintiff's mental impairment, <u>see</u> Section IV.B. <u>infra</u>, the failure to obtain some of plaintiff's mental health records is significant. Remand is appropriate because "[the Commissioner] has not alleged, let alone demonstrated, that the ALJ requested records from [CHR]." <u>Rodgers v. Colvin</u>, No. 15 CV 1449 (JCH), 2016 WL 4432678, at *5 (D. Conn. Aug. 17, 2016), <u>citing Drake v. Astrue</u>, 443 F. App'x 653, 656 (2d Cir. 2011).

B. CONSIDERATION OF PLAINTIFF'S MENTAL IMPAIRMENT

Plaintiff argues that the ALJ erred in his evaluation of the so-called "paragraph B" criteria for evaluating a mental impairment. (Dkt. #22, Brief at 4-10). At step three of the sequential analysis, the ALJ evaluated whether plaintiff meets or medically equals the criteria for Listing 12.04, Affective Disorders. With certain limited exceptions referred to as "paragraph C" criteria,[13] Listing 12.04 requires a claimant to experience at least two of the following "paragraph B" criteria:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

---

[13]The ALJ also considered whether plaintiff satisfied "paragraph C" criteria under Listing 12.04, but found that plaintiff does not satisfy the criteria. (Tr. 14). Because plaintiff does not object to the ALJ's "paragraph C" analysis, it will not be discussed in this ruling.

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404 Subpt. P, App. 1, §12.04(B)(effective January 2, 2015 through May 17, 2015). The ALJ found that plaintiff has no restriction in his activities of daily living (Tr. 13); moderate difficulties in maintaining social functioning (Tr. 14); mild difficulties in maintaining concentration, persistence, or pace (id.); and no episodes of decompensation of an extended duration (id.). Because the ALJ found that plaintiff's mental impairment did not cause him to have "marked limitations" in two categories, or "marked limitation" in one category plus repeated episodes of decompensation, the ALJ found that plaintiff did not meet Listing 12.04. (Id.). The ALJ's analysis of the first three "paragraph B" criteria will be considered individually.

<u>1. ACTIVITIES OF DAILY LIVING</u>

The ALJ found that plaintiff was "capable of performing a wide variety of activities of daily living independently[,]" in that he demonstrated "surprisingly good" hygiene while homeless, is able to take care of personal grooming, required "some assistance in the completion of household chores in that he was provided with meals by soup kitchens[,]" but at the time of the hearing "appear[ed] capable of maintaining his home independently." (Tr. 13). Based on these observations, the ALJ concluded that plaintiff was "capable of performing activities of daily living with little assistance or intervention from others consistent with a finding of no limitation in this area." (Id.).

The regulations define activities of daily living as including "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and

directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) (effective Jan. 2, 2015 to May 17, 2015). In evaluating this area of functioning, the ALJ is to "determine the extent to which [the claimant is] capable of initiating and participating in activities independent of supervision or direction." (Id.).

The ALJ's finding of "no limitation" in plaintiff's activities of daily living is not supported by substantial evidence. Although plaintiff's hygiene is described favorably (Tr. 708, 392, 614, 903), the record reflects severe limitations in nearly every other ADL such that plaintiff was unable to initiate activities to meet his most fundamental needs. Plaintiff lived on the street because he lacked the "know-how" to get himself into a shelter (Tr. 44), and at a time when he was homeless, plaintiff reported that he was eligible for unemployment benefits but did not apply because it was too hard for him. (Tr. 353). Plaintiff was unable to prepare or plan meals because he did not have a kitchen (Tr. 286, 47), and in fact plaintiff's weight fluctuated dramatically because he struggled to feed himself consistently. (Tr. 47, 567, 603). Plaintiff was homeless for years and thus did no house or yard work. (Tr. 287). Plaintiff does not engage in any hobbies besides sometimes watching TV at a shelter because he is homeless. (Tr. 288). The ALJ's claim that plaintiff "appears to have some assistance in the completion of household chores [such as providing meals]" (Tr. 13) is, at best, a dramatic overstatement of plaintiff's abilities during the period he was homeless.

Even once plaintiff acquired an apartment with extensive help from his case worker, plaintiff's ADLs did not improve. Although according to the ALJ plaintiff "appears capable of maintaining his home independently[,]" (id.), plaintiff failed to make efforts to acquire furniture or supplies, such as pots and pans, for his apartment. (Tr. 49, 73). As of

the hearing, plaintiff slept on the floor, ate sandwiches and drank Ensure, when he ate at all. (Tr. 47, 58). Plaintiff is clearly limited in his ability to maintain a residence and prepare meals.

Plaintiff also struggles to medicate himself: plaintiff could not identify his medications at the hearing (Tr. 42) and obtaining medication refills appears to overwhelm plaintiff such that, at times, he takes his medication every other day to make it last longer. (Tr. 896, 59-60). Decker testified extensively as to how much he assists plaintiff (Tr. 68), including ensuring he takes his medications (Tr. 68-69); scheduling and attending doctor's appointments (Tr. 49, 68-69, 506-07); checking plaintiff is not suicidal (Tr. 49); assisting plaintiff in acquiring housing (Tr. 67); managing plaintiff's entitlements (Tr. 68); accompanying and assisting plaintiff in meeting with an attorney about his Social Security claim (Tr. 516); and acquiring plaintiff's medical records (Tr. 516-19). In the context of a claimant's activities of daily living, "marked" limitation is not defined by a specific number of different activities of daily living in which functioning is impaired, "but by the nature and overall degree of interference with function." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(C)(1). It is clear that the nature and overall degree of limitation in plaintiff's activities of daily living was not properly considered by the ALJ.

### 2. SOCIAL FUNCTIONING

Social functioning refers to one's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2)(effective January 2, 2015 through May 17, 2015). It includes "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning

by, for example, . . . avoidance of interpersonal relationships, or social isolation." Id. Social functioning is also evaluated by the ability to "interact and actively participate in group activities." Id. The ALJ found that plaintiff has moderate limitations in social functioning, noting that plaintiff reports some instances of experiencing paranoia but is generally described as "polite, friendly and cooperative." (Tr. 14). The ALJ further observed that plaintiff is in group therapy but does not participate, and that plaintiff's case worker reported that plaintiff exhibits isolative behavior. (Id.).

However, it appears that the ALJ dismissed Decker's observations about plaintiff's isolative behavior primarily because plaintiff was homeless and lived in public spaces. (Tr. 18-19). In evaluating Decker's description of plaintiff's isolative behavior, the ALJ found it "significant to point out that [plaintiff] has been homeless for a large portion of the relevant period and been staying mostly in public places. Accordingly, . . . references to [plaintiff's] isolative behaviors appears inconsistent with the facts." (Tr. 19). Socially isolative behavior describes the degree to which one, of his or her own volition, avoids society and interpersonal relationships with others. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2)(effective January 2, 2015 through May 17, 2015)(impaired social functioning can be demonstrated by "fear of strangers, avoidance of interpersonal relationships, or isolation"). The time plaintiff spent in public places because of his involuntary homelessness does not undermine claims that plaintiff is isolative; as plaintiff appropriately observes, people can engage in isolative behavior regardless of where they call "home." (Dkt. #22, Brief at 14).[14] The ALJ provided no rationale for determining that

_____

[14]Rather than being inconsistent with each other, evidence seems to suggest that homelessness and social isolation are linked and can even exacerbate each other. Joan Smith, Hussein Bushnaq, Andrew Campbell, Luma Hassan, Sanjay Patel and Sam Akpadio, Valuable Lives: Capabilities and resilience amongst single homeless people, at 18, available at

plaintiff's homelessness undermines claims that plaintiff engaged in isolative behavior, but in so doing, the ALJ failed to fully consider the evidence of plaintiff's social limitations.[15]

3. CONCENTRATION, PERSISTENCE OR PACE

Concentration, persistence or pace refers to "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3)(effective January 2, 2015 through May 17, 2015). The ALJ found that plaintiff has mild difficulties in this area, referring to reports of some difficulty with concentration and avoidance of tasks that require it, as well as plaintiff's sometimes illogical or circumstantial thoughts. (Tr. 14). However, these findings notwithstanding, the ALJ found it significant that plaintiff is "capable of attending appointments and managing his own medications, which is consistent with findings of an intact memory." (Id.). Yet, as discussed in Section IV.B.1 supra, plaintiff is not capable of managing his own medication: he cannot remember what medication he takes (Tr. 42); he forgets or avoids scheduling appointments for refills often enough that he rations himself with less medication than he requires (Tr. 638, 896, 59-60); he does not consistently take his medication (Tr. 354, 398, 404, 620, 638, 909); and he requires reminders from his case worker to take his medication and go to doctors' appointments (Tr. 69, 502-05, 506-07).

---

http://www.crisis.org.uk/data/files/publications/Valuable_Lives.pdf ("For many of our participants, social isolation preceded homelessness and the experience then exacerbated the isolation . . . .")(last visited March 15, 2017); Alice Baum and Donald Burnes, A nation in denial: The truth about homelessness (1993), abstract at http://psycnet.apa.org/psycinfo/1993-97842-000 (review of evidence that up to 85 percent of homeless adult suffer from substance abuse and mental illness, as well as serious social isolation).

[15]This judicial officer has been reviewing Social Security appeals for more than three decades, and the ALJ's conclusion that plaintiff being homeless in public places negates a finding of isolative behavior is one of the most callous and mean-spirited that she has ever read.

In finding "mild difficulties" in this area, the ALJ also relied upon plaintiff's reports that he has "the ability to plan meals, watch television, listen to music, and do arts and crafts, suggesting that he is capable of sustained concentration." (Tr. 14, <u>citing</u> Exhibit 15F). However, the exhibit cited by the ALJ shows just the opposite: plaintiff checks that he "needs help" with each of the activities cited by the ALJ. (Tr. 967). Furthermore, above the list of activities, plaintiff wrote, "Half of this stuff I don't do period. I don't have the capabilities or access." (<u>Id.</u>). The record contains no evidence that plaintiff is capable of tasks as involved as meal planning or arts and crafts. The ALJ's finding that plaintiff is capable of sustained concentration is further undermined by the fact that plaintiff was even unable to complete the Activities of Daily Living forms himself: both of plaintiff's Activities of Daily Living forms were completed by someone else on his behalf, either his mother (Tr. 265-72) or friend[16] (Tr. 284-91). Rather than having only mild limitations in maintaining concentration, persistence and pace, as plaintiff appropriately observes, the record reflects that plaintiff "requires a one-on-one caseworker" to prompt him to complete many of "the basic tasks necessary for his own survival." (Dkt. #22, Brief at 8).

The errors in the ALJ's application of "paragraph B" criteria to plaintiff's mental impairment impact both his findings in step three about whether plaintiff meets Listing 12.04, and his findings on plaintiff's mental RFC in step four. In assessing a claimant's mental residual functional capacity, the SSA will:

> assess the nature and extent of [a claimant's] mental limitations and restrictions and then determine [his] residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding,

---

[16]Although plaintiff's signature is in the line for "Name of Person Completing Form" (Tr. 291), the substance of the form appears to be in the handwriting of Mattie Dent, who listed herself in section B as the friend or relative to contact about plaintiff's condition.

remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [the claimant's] ability to do past work and other work.

20 C.F.R. §§ 404.1545(c), 416.945(c). As an analysis of a claimant's work-related abilities in spite of his impairments, the mental RFC assessment "complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders when your impairment(s) is severe but [does not meet or equal a listing]." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)(effective January 2, 2015 through May 17, 2015). After applying the "paragraph B" criteria, the ALJ explained that his mental residual functional capacity assessment relied upon his "paragraph B" findings. (Tr. 15)("[T]he following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."). Accordingly, on remand, the ALJ shall reevaluate plaintiff's mental impairment as it applies to steps three and four.

Defendant argues that the ALJ's findings of plaintiff's mental limitations properly relied on the findings of state agency psychological consultants, Dr. Augenbraun and Dr. Harris. (Dkt. #25, Brief at 9). While an ALJ may rely on the opinions of State agency consultants as they are "are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation[,]" 20 C.F.R. §§ 404.1527(e)(2)(i) and 416.927(e)(2)(i), such reliance is proper when the consultant's opinions are supported by other facts in the record, and they provide substantial evidence for the ALJ's findings. See 20 C.F.R. §§ 404.1527(e)(2)(ii) and 416.927(e)(2)(ii).[17]

---

[17]These regulations have been revised as of March27, 2017. See 20 C.F.R. §§ 04.1513a(b)(1), 416.913a(b)(1).

However, the ALJ did not refer to either of the psychological consultants' opinions, nor mention either opinion anywhere in his decision. Accordingly, these opinions are not substantial evidence supporting the ALJ's finding. See Baldwin v. Colvin, No. 15 CV 1462 (JGM), 2016 WL 7018520, at *10 (D. Conn. Dec. 1, 2016)(an ALJ's reliance upon a consultant's opinion is insufficient when he "did not cite to specifics of [that consultant's] opinion, and in fact did not even refer to [that consultant] by name."). Although defendant's brief argues that the ALJ's mental health findings were supported by plaintiff's treating sources, defendant selectively cites to two pages of plaintiff's mental health treatment records (Dkt. #25, Brief at 9, citing Tr. 663-64) and ignores the hundreds of other pages of these records which discuss symptomology including hallucinations, paranoia, dramatic weight fluctuations, and inability to feed himself consistently.

### C. EVALUATION OF TREATING SOURCES

#### 1. MEDICAL EVIDENCE

Plaintiff argues that the ALJ failed to give controlling weight to reports by plaintiff's treating sources. (Dkt. #22, Brief at 12-16). The treating physician rule generally requires an ALJ to give "special evidentiary weight" to the medical opinion of a claimant's treating physician. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). The opinion of a treating physician on the nature and severity of a claimant's impairment will be assigned controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record[.]" 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). Such opinions are not afforded controlling weight, however, when

they are inconsistent with other substantial evidence in the record, such as the opinions of other medical experts. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)(treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record")(citations omitted). When a claimant's treating physician is not given controlling weight, the ALJ is to consider the length, nature, and extent of the treatment relationship, as well as the supportability, consistency and specialization of the source's opinion, in determining the weight to give the treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 404.1527(c)(2)(i)-(ii), 404.1527(c)(3)-(6), 416.927(c)(2), 416.927(c)(2)(i)-(ii), and 416.927(c)(3)-(6). When a treating physician is not given controlling weight, the ALJ "must specifically explain the weight that is actually given to the opinion." Shrack v. Astrue, 608 F. Supp. 2d 297, 301 (D. Conn. 2009)(citation omitted).

Plaintiff contends that the ALJ erred in assigning "little weight" to Dr. Quraishi's opinion (Dkt. #22, Brief at 12-13; Tr. 18) that plaintiff can "never" sit, stand, walk, lift, carry, bend, squat, crawl, climb, or reach during the work day. (Tr. 252-54). As the ALJ noted, Dr. Quraishi's treatment notes reflect intermittent complaints of hip pain, tenderness to palpation and movement limited by pain, but plaintiff's physical examinations are generally normal. (Tr. 18, 371-72, 379-80, 829-30). There are no objective medical signs or laboratory findings that support the physical limitations opined by Dr. Quraishi, and diagnostic imaging ordered by Dr. Quraishi showed only minor degenerative changes in plaintiff's hip. (Tr. 826, 840, 844). The ALJ appropriately accorded Dr. Quraishi's opinion little weight because it is "inconsistent with the totality of the evidence, which indicates a greater level of ability than opined by Dr. Quraishi." (Tr.

18). Thus, under the circumstances of this case, the ALJ did not err in his treatment of Dr. Quraishi's opinion.

Plaintiff further contends that the ALJ erred in his "complete rejection" of the InterCommunity reports signed by Dr. Ronald Hensley and Dr. Anees Ahmed. (Dkt. #22, Brief at 13-14). Dr. Hensley and Dr. Ahmed co-signed reports prepared by Shawn Decker, plaintiff's case worker, but the record "does not indicate that either of these doctors had any personal interaction with the claimant." (Tr. 18). Plaintiff argues that the reports Drs. Henley and Ahmed co-signed reflect their medical opinions and should be afforded the weight due to treating physicians. (Dkt. #22, Brief at 14). To the extent that plaintiff "may argue that th[ese] co-signature[s] convert[] [Decker's] 'other source' opinion into one from an 'acceptable medical source' entitled to controlling weight, this argument must fail." Goulart v. Colvin, No. 15 CV 1573 (WIG), 2017 WL 253949, at *4 (D. Conn. Jan. 20, 2017). When an "other source" opinion is cosigned by a psychiatrist, "but there are no records or other evidence to show that the psychiatrist treated" the claimant, as in the instant case, that other source "opinion does not constitute the opinion of the physician." Id., citing Perez v. Colvin, No. 13 CV 868 (HBF), 2014 WL 4852836, at *26 (D. Conn. Apr. 17, 2014), Magistrate Judge's Recommended Ruling approved and adopted over objection, No. 13 CV 868 (JCH), 2014 WL 4852848 (D. Conn. Sept. 29, 2014). Although plaintiff asserts that both Dr. Ahmed and Dr. Hensley are "obviously" part of plaintiff's treatment team (Dkt. #22, Brief at 14), there is no indication that either treated, or even examined, plaintiff; accordingly, the ALJ did not err in failing to treat these opinions as medical evidence or opinions of a treating physician. Goulart, 2017 WL 253949, at *4.

However, the ALJ's decision does not reflect consideration of all the records of plaintiff's treating physicians. The ALJ notes that plaintiff was admitted to the hospital for psychiatric care in September 2012 and that by discharge he had rapidly improved (Tr. 16-17), but fails to discuss any of the treatment notes from this admission. Plaintiff was treated by multiple physicians who diagnosed plaintiff with prolonged depression (Tr. 352) and "[d]epressive disorder NOS and R/O Schizoaffective disorder," and who assigned plaintiff GAF scores of 25 and 26. (Tr. 355, 359). Until 2013, GAF scores were used as a mental health tool to opine on a patient's level of overall functioning, and scores in the mid-20s describe someone whose "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas." See DSM-IV 27 (4th ed. Text Revision 2000).[18] While GAF scores do not directly correlate with the severity requirements in SSA's mental disorders listing, Griffin v. Colvin, No. 15 CV 105 (JGM), 2016 WL 912164, at *16 (D. Conn. Mar. 7, 2016), citing Corporan v. Comm'r of Soc. Sec., No. 12 CV 6704 (JPO), 2015 WL 321832, at *12, n. 9 (S.D.N.Y. Jan. 23, 2015), and an ALJ's failure to consider each GAF score is not reversible error, Schneider v. Colvin, No. 3:13 CV 790 (MPS), 2014 WL 4269083, at *4 (D. Conn. Aug. 29, 2014), citing Parker v. Comm'r of Soc. Sec. Admin., No. 10-cv-195, 2011 WL 1838981, at *5 (D. Vt. May 13, 2011)("[A]n ALJ's failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination.")(citations omitted), that does not mean that a treating physician's GAF assessment and the associated treatment notes can be ignored.

_____

[18]GAF scores were used under the fourth edition of the Diagnostic and Statistical Manual ("DSM-IV") to refer to a person's overall level of functioning, with higher scores reflecting greater functioning. While the use of GAF scores was eliminated in the transition from the DSM-IV to the DSM-V in 2013, plaintiff's 2012 GAF assessments preceded that transition.

After the use of GAF scores was phased out, the SSA provided guidance instructing ALJs to treat GAF scores as opinion evidence and primarily consider the details of the clinician's accompanying description. Mainella v. Colvin, No. 13 CV 2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)("Generally, the [SSA] guidance [on the use of GAF scores] instructs ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than the numerical range, should be used."). Similarly, courts have held that discussion of a GAF score is not required when the ALJ expressly discusses the clinical notes accompanying the score. See Zabala v. Astrue, No. 05 CV 4483 (WHP), 2008 WL 136356, at *4 (S.D.N.Y. Jan. 14, 2008)(internal quotation marks & citations omitted)("[W]hile the ALJ did not specifically discuss [plaintiff's] low GAF score, the ALJ did expressly discuss the clinical notes that accompanied the score."), aff'd, 595 F.3d 402 (2d Cir. 2010). Here, the ALJ did not acknowledge the GAF score either in Dr. Hedberg's or Dr. Fisk's evaluation of plaintiff, nor did he mention the accompanying notes reflecting plaintiff's impaired functioning. Accordingly, this judicial officer cannot determine whether this evidence was treated as "opinion evidence," or even considered at all.

## 2. OTHER SOURCES

Plaintiff alleges that the ALJ erred in his treatment of other sources, including plaintiff's case worker, Shawn Decker. (Dkt. #22, Brief at 14-16). Non-medical or other sources including nurse practitioners, therapists, and public or private social agency personnel, may be considered in evaluating "the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006); 20 C.F.R. §§ 404. 1513(d) and 416.913(d).

With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as <u>nurse practitioners</u>, physician assistants, and <u>licensed clinical social workers</u>, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06–03p, 2006 WL 2329939 at *3 (emphasis added). When weighing the opinions of other sources, ALJs are instructed to consider the following:

(1) How long the source has known and how frequently the source has seen the individual;

(2) How consistent the opinion is with other evidence;

(3) The degree to which the source presents relevant evidence to support an opinion;

(4) How well the source explains the opinion;

(5) Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

(6) Any other factors that tend to support or refute the opinion.

<u>Id.</u> at *4-5. The record includes evidence from a number of "other sources," including plaintiff's case worker, Decker, four licensed clinical social workers, and one advanced practice registered nurse, all from InterCommunity.

The ALJ assigned "little weight" to Decker's opinion, finding that it was unsupported by any objective evidence and is not "an accurate portrayal of the claimant's overall functional abilities." (Tr. 19). The ALJ did not explicitly consider any of the above factors, including that Decker has seen plaintiff at least weekly for a two-year period (Tr. 67, 69), and explained his opinion both in plaintiff's mental health records and in hearing

48

testimony. (Tr. 67-73, 524-31). The ALJ primarily objected to the credibility of Decker's testimony because the ALJ inappropriately found that plaintiff's homelessness undermined Decker's statements describing plaintiff's isolative behavior. <u>See</u> Section IV.B.2. <u>supra</u>. The ALJ claims that Decker does "not indicate that any mental status examinations were performed during the claimant's sessions and mostly refer only to the various forms of assistance provided to the claimant. The records provided [do] not reference findings of a flat affect or the isolative behaviors reported by . . . Decker." (Tr. 19). However, Decker provided a detailed functional assessment of plaintiff's daily living activities (Tr. 429-35), as well as a mental status exam that specifically addressed plaintiff's ability to handle frustration, meet the ordinary demands of a work environment, interact appropriately with others in a work environment, ask questions, get along with others, carry out single-step and multi-step instructions, switch tasks, and perform work actively on a sustained basis. (Tr. 416-18).

Additionally, while Decker did not regularly perform plaintiff's mental status examinations, the ALJ fails to acknowledge the mental status examinations performed by Decker's InterCommunity colleagues who were part of plaintiff's treatment team. (Tr. 392-95, 583-84, 708-13). Accordingly, the ALJ did not properly consider Decker's opinions about plaintiff's functional abilities. Moreover, the ALJ completely failed to mention the treatment records of four LCSWs and one APRN who treated plaintiff at InterCommunity: Gillian Workman-Stein, LCSW; Vivian Carr-Allen, LCSW; Heidi Friedland, LSCW; Mary Salustri, LCSW; and Marina Sciucco, APRN. While LCSWs and APRNs are "other sources" and not "acceptable medical sources," 20 C.F.R. § 416.913(a), (d), "that does not mean

an ALJ can ignore the[se] . . . opinion[s] entirely." <u>Crowder v. Colvin</u>, 561 F. App'x 740, 744-45 (10th Cir. 2014).

Workman-Stein's treatment records include mental status examinations of plaintiff opining that his thought content exhibited mild paranoid delusion (Tr. 709, 383); his thought process exhibited mild auditory and visual hallucinations (<u>id.</u>); he was moderately depressed and moderately anxious (Tr. 710-11); he had a full affect (<u>id.</u>); he experienced moderate despair (<u>id.</u>); he had mild impairment of his concentration/attention (<u>id.</u>); he exhibited fair insight and judgment (<u>id.</u>); he had great difficulty sleeping and at times does not sleep at all (Tr. 383, 849); and he had a disturbed sense of reality as evidenced by visual hallucinations and paranoia with respect to others putting thoughts in his head, but it was "[u]nclear if [this is] psychosis or if there is a malingering quality[.]" (<u>Id.</u>). Workman-Stein diagnosed plaintiff with major depressive disorder, moderate, and rule out severe with psychotic features (Tr. 385, 426, 851), and provided evidence supporting her findings, including hospitalizations, low motivation, low energy, suicidal thoughts, and racing thoughts. (Tr. 382-84, 848-50). Workman-Stein's assessment was signed by Dr. Ann L. Price the following day. (Tr. 387, 853). Workman-Stein later performed a crisis evaluation on plaintiff, after which she opined that plaintiff was "not actively suicidal" and denied that he was a danger to himself or others and was aware of how to get to the hospital if he has suicidal intent. (Tr. 452). The ALJ fails to mention any of Workman-Stein's treatment of plaintiff.

Carr-Allen treated plaintiff both in the Depression and Anxiety Therapy Group, and for a period in individual therapy. Carr-Allen's records reflect plaintiff's inability to participate in group therapy (Tr. 535-36), his affect (Tr. 535-56, 541-42, 549-50), his

evaluation of his depression on a one to ten scale (Tr. 543-44, 549-50, 553-54, 563-64), and the basis for referring plaintiff for a crisis evaluation (Tr. 535-36). Carr-Allen also provided plaintiff with individual therapy, in which their goal was to return plaintiff to baseline functioning given his depression (Tr. 593); in such meetings plaintiff told Carr-Allen that he had no appetite such that he only ate three or four bites of food per day, he was not sleeping, he had little interest or motivation, and he experienced suicidal thoughts off-and-on. (Tr. 603). Carr-Allen observed that plaintiff had no energy or motivation, plaintiff required two crisis evaluations, and Carr-Allen assessed plaintiff with a GAF score of 36. (Tr. 388, 390-91). The ALJ similarly failed to mention any of Carr-Allen's treatment of plaintiff.

Heidi Friedland, LCSW, evaluated plaintiff's mental health and noted that plaintiff continued to experience auditory and visual hallucinations, constant anxiety, disorganized and depressed mood, poor sleeping, and poor eating such that he had not eaten in days. (Tr. 567-71). Friedland opined that plaintiff was "highly tangential," and struggled expressing himself; she gave him a GAF score of 30. (Tr. 567, 570). Friedland recommended that plaintiff join a small therapy group for individuals with persistent mental illness. (Tr. 568). The ALJ failed to specifically mention Friedland's evaluation of plaintiff.

Mary Salustri, LCSW, worked with plaintiff when he joined a group for individuals with "symptoms of schizophrenia, schizoaffective disorder, bipolar disorder, and depression with psychosis[,]" with a focus on discussing participants' "experiences with psychotic symptoms." (Tr. 760-61). Salustri described plaintiff as "tangential" and pre-contemplative about changes he could make in his life (Tr. 740-41); in group he provided

a lot of off-topic information. (Tr. 734-35). During sessions plaintiff described visual hallucinations in which he saw people running by him when no one was there (Tr. 744-45), or his belief that people in the television screen were watching him. (Tr. 754-55). Salustri reported that participation in this group appeared to help plaintiff, and that plaintiff reported that his medication was "helping [him] to have clear thoughts." (Tr. 746-47). Salustri evaluated plaintiff in February 2014, noting that plaintiff was increasing his understanding of his illness and was able to discuss his weekly auditory hallucinations and seeing shadows of people who are not there multiple times each day; plaintiff continued to experience low motivation and low energy. (Tr. 581, 863). Salustri opined that plaintiff had moderately severe impairments with respect to health practices, housing stability, communication, safety, managing time, managing money, nutrition, problem solving, family relationships, leisure, productivity, and coping skills. (Tr. 583-84). Salustri gave plaintiff a GAF score of 33, and changed his diagnosis to major depressive disorder, recurrent, severe with psychotic features. (Tr. 584-85).

The ALJ's failure to discuss any of the treatment notes by the four LCSWs that worked with plaintiff at InterCommunity is troubling. "While the ALJ was free to conclude that the opinion of a licensed social worker was not entitled to any weight, the ALJ had to explain that decision." Canales v. Comm'r of Soc. Sec., 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010).

The ALJ also failed to discuss the treatment notes of Marina Sciucco, APRN, who evaluated plaintiff regularly to manage his psychiatric medication. APRN Sciucco noted plaintiff's dramatic weight fluctuations including losing twenty-three pounds in eight months (Tr. 392, 614, 903), and his sad affect with mild constriction. (Tr. 393-95, 615-

17, 904-06). APRN Sciucco gave plaintiff a GAF score of 36. (Tr. 396, 618, 907). In April 2014, APRN Sciucco opined that plaintiff had a flat affect, experienced severe weight changes, thought errors, and depression. (Tr. 652, 941). In August 2014, plaintiff had lost six pounds, was experiencing sleep difficulty and moderately severe changes in mood, and told APRN Sciucco that he was taking his medication every other day. (Tr. 875-76).

Under the Regulations, "other source" opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 232939, at *3. Accordingly, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning[.]" Id. at *6. Because the ALJ in the instant case failed to mention five "other sources" who treated plaintiff, this Court is unable to follow the ALJ's reasoning in determining plaintiff's functional limitations.

### D. REMAINING ARGUMENTS

For the reasons explained above, plaintiff's remaining arguments will, by necessity, be addressed by the ALJ on remand.

### V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner (Dkt. #22) is granted in limited part such that the matter is remanded for further proceedings consistent with this Ruling and defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #25) is denied.

See 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen calendar days after service of same);** FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Impala v. United States Dept. of Justice, 670 F. App'x 32 (2d Cir. 2016)(summary order)(failure to file timely objection to Magistrate Judge's recommended ruling **will** preclude further appeal to Second Circuit); cf. Small v. Sec'y, H&HS, 892 F.2d 15, 16 (2d Cir. 1989)(failure to file timely objection to Magistrate Judge's recommended ruling **may** preclude further appeal to Second Circuit).

Dated this 12th day of January, 2018 at New Haven, Connecticut.


/s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge